EXHIBIT "1"

**323603**

Record and Return To:
Title Source Inc.
1450 W. Long Lake Rd. Ste. 400
Troy, MI 48098

MIN 100039046927089793

# Open End Mortgage

**WORDS USED OFTEN IN THIS DOCUMENT:**

**(A)  Security Instrument.**  This document, which is dated            December 15, 2005
will be called the "Security Instrument."

**(B)  Borrower.**            Kevin R. Carson and Tamara M. Carson, husband and wife

residing at 19263 NW Parkway , Marysville, OH 43040
sometimes will be called "Borrower" and sometimes simply "I" or "me."

**(C)  Lender.**    Quicken Loans Inc.      will be called "Lender." Lender is a corporation that exists
under the laws of the State of Michigan. Lender's address is  20555 Victor Parkway, Livonia,
MI  48152

**(D)  MERS.**  "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation
that is acting solely as a nominee for Lender and Lender's successors and assigns.  **MERS is the
mortgagee under this Security Instrument.**  MERS exists under the laws of Delaware, and has an
address and telephone number of P.O. Box 2026, Flint, MI  48501-2026, tel. (888) 679-MERS.

**(E)  Note.**  The Home Equity Line Agreement, Disclosure Statement and Note signed by Borrower and
dated      December 15, 2005          will be called the "Note." The Note provides for loan
advances to be made by the Lender to the Borrower from time to time,  and for a period not to exceed
     10     years (the "Draw Period"), during which loan advances may be repaid and reborrowed up to
an amount not to exceed the sum of US $40,000.00          . The Note also provides that after
the Draw Period terminates, then outstanding balance must be repaid within     20    years.

**(F)  Property.**  The Property that is described below in the section titled "Description of the Property,"
will be called the "Property."

**(G)  Sums Secured.** The amounts described below in the section titled "Borrower's Transfer to Lender
of Rights in the Property" sometimes will be called the "Sums Secured."

**BORROWER'S TRANSFER TO LENDER OF RIGHTS IN THE PROPERTY:**
I mortgage, warrant, grant and convey the Property, with power of sale, to MERS (solely as nominee for
Lender and Lender's successors and assigns) and its successors and assigns subject to the terms of
this Security Instrument.  This means that, by signing this Security Instrument, I am giving the Lender
those rights that are stated in this Security Instrument and also those rights that the law gives to lenders
who hold mortgages on real property.  I am giving Lender these rights to protect Lender from possible
losses that might result if I fail to:

(A)  Pay all the amounts that I owe Lender as stated in the Note;

(B)  Pay, with interest, any amounts that Lender spends under Paragraph 6 of this Security Instrument
to protect the value of the Property and Lender's rights in the Property; or

(C)  Keep all of my other promises and agreements under this Security Instrument.

I understand and agree that MERS holds only legal title to the rights granted by me in this Security
Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's
successor and assigns) has the right:

OR656 PG330



(A) to exercise any or all of those rights, including, but not limited to, the right to foreclose and sell the Property; and

(B) to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

**DESCRIPTION OF THE PROPERTY:**
I give MERS (solely as nominee for Lender and Lender's successors and assigns) rights in the Property described in (A) through (I) below:

(A) The Property which is located at 19263 NW Parkway, Marysville, OH 43040

This Property is in            Union            County. It has the following legal description:
SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.
SUBJECT TO COVENANTS OF RECORD.
(B) All buildings and other improvements that are located on the Property described in Subparagraph (A) of this Paragraph;

(C) All easements, rights and appurtenances attached to the Property that I have as owner of the Property described in Subparagraph (A) of this Paragraph;

(D) All rents or royalties from the Property described in Subparagraph (A) of this Paragraph;

(E) All mineral, oil and gas rights and profits, water rights and stock that are part of the Property described in Subparagraph (A) of this Paragraph;

(F) All rights that I have in the land which lies in the streets or roads in front of, or next to, the Property described in Subparagraph (A) of this Paragraph;

(G) All fixtures that are now or in the future will be on the Property described in Subparagraphs (A) and (B) of this Paragraph;

(H) All of the rights and Property described in Subparagraphs (B) through (G) of this Paragraph that I acquire in the future; and

(I) All replacements of or additions to the Property described in Subparagraphs (B) through (H) of this Paragraph.

**BORROWER'S RIGHT TO MORTGAGE THE PROPERTY AND BORROWER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY:**
I promise that:  (A) I lawfully own the Property;  (B) I have the right to mortgage, grant and convey the Property to Lender; and (C) there are no outstanding claims or charges against the Property, except for those which are of public record.

I give a general warranty of title to Lender.  This means that I will be fully responsible for any losses which Lender suffers because someone other than myself has some of the rights in the Property which I promise that I have.  I promise that I will defend my ownership of the Property against any claims of such rights.

**PLAIN LANGUAGE SECURITY INSTRUMENT:**
This Security Instrument contains uniform promises and agreements that are used in real property security instruments all over the country.  It also contains non-uniform promises and agreements that vary, to a limited extent, in different parts of the country.  My promises and agreements are stated in "plain language."

**UNIFORM COVENANTS**

I promise and I agree with Lender as follows:

**1. BORROWER'S PROMISE TO PAY:** I will pay to Lender on time principal and interest due under the Note and all late charges and other charges due under the Note.

**2. APPLICATION OF BORROWER'S PAYMENTS:** Unless the law requires otherwise, Lender will apply each of my payments under the Note and under Paragraph 1 above in the following order and for the following purposes: First, to finance charges under the Note; next, to all other fees and charges due; and last, to principal.

**3. BORROWER'S OBLIGATION TO PAY CHARGES, ASSESSMENTS AND CLAIMS:** I will pay all taxes, assessments, and any other charges and fines that may be imposed on the Property and that may be superior to this Security Instrument.  I will also make payments due under my lease if I am a tenant on the Property and I will pay ground rents (if any) due on the Property.

Any claims, demand or charge that is made against the Property because an obligation has not been fulfilled is known as a "lien." I will promptly pay or satisfy all liens against the Property that may be superior to this Security Instrument. However, this Security Instrument does not require me to satisfy a superior lien if: (A) I agree, in writing, to pay the obligation which gave rise to the superior lien and Lender approves the way in which I agree to pay that obligation, but only so long as I continue paying the obligation in accordance with my written agreement; (B) in good faith, I argue or defend against the superior lien in a lawsuit so that, during the lawsuit, the superior lien may not be enforced and no part of the Property must be given up, but only during the lawsuit; or (C) I secure from the holder of that other lien an agreement, approved in writing by Lender, that the lien of this Security Instrument is superior to the lien held by that person. If Lender determines that any part of the Property is subject to a superior lien that is not permissible under one of these three exceptions, Lender may give Borrower a notice identifying the superior lien. Borrower shall pay or satisfy the superior lien or take one or more of the actions set forth above within 10 days of the giving of notice.

**4.   BORROWER'S OBLIGATION TO MAINTAIN HAZARD INSURANCE:** I will obtain hazard insurance to cover all buildings and other improvements that now are or in the future will be located on the Property. The insurance must cover loss or damage caused by fire, hazards normally covered by "extended coverage" hazard insurance policies and other hazards for which Lender requires coverage. The insurance must be in the amounts and for the periods of time required by Lender. I may choose the insurance company, but my choice is subject to Lender's approval. Lender may not refuse to approve my choice unless the refusal is reasonable.

All of the insurance policies and renewals of those policies must include what is known as a "standard mortgage clause" to protect Lender. The form of all policies and renewals must be acceptable to Lender. Lender will have the right to hold the policies and renewals. If Lender requires, I will promptly give Lender all receipts of paid premium and renewal notices that I receive.

If there is a loss or damage to the Property, I will promptly notify the insurance company and Lender. If I do not promptly prove to the insurance company that the loss or damage occurred, then the Lender may do so.

The amount paid by the insurance company is called the "proceeds." The proceeds will be used to repair or to restore the damaged Property unless: (A) it is not economically feasible to make the repairs or restoration; (B) the use of the proceeds for that purpose would lessen the protection given to Lender by this Security Instrument; or (C) Lender and I have agreed in writing not to use the proceeds for that purpose. If the repair or restoration is not economically feasible or if it would lessen Lender's protection under this Security Instrument, then the proceeds will be used to reduce the amount that I owe to Lender under the Note and under this Security Instrument. If any of the proceeds remain after the amount that I owe to Lender has been paid in full, the remaining proceeds will be paid to me.

If I abandon the Property, or if I do not answer, within 30 days, a notice from Lender stating that the insurance company has offered to settle a claim, Lender may collect the proceeds. Lender may use the proceeds to repair or restore the Property or to pay the Sums Secured. The 30-day period will begin when the notice is given.

If any proceeds are used to reduce the amount of principal which I owe to Lender under the Note, that use will not delay the due date or change the amount of any of my monthly payments under the Note and under Paragraphs 1 and 2 above. However, Lender and I may agree in writing to those delays or changes.

If Lender acquires the Property under Paragraph 18 below, all of my rights in the insurance policies will belong to Lender. Also, all of my rights in any proceeds which are paid because of damage that occurred before the Property is acquired by Lender or sold will belong to Lender. However, Lender's rights in those proceeds will not be greater than the Sums Secured immediately before the Property is acquired by Lender or sold.

**5.   BORROWER'S OBLIGATION TO MAINTAIN THE PROPERTY AND TO FULFILL ANY LEASE OBLIGATIONS:** I will keep the Property in good repair. I will not destroy, damage or substantially change the Property, and I will not allow the Property to deteriorate. If I do not own but am a tenant on the Property, I will fulfill my obligations under my lease. I also agree that, if I acquire the fee title to the Property, my lease interest and the fee title will not merge unless Lender agrees to the merger in writing.

**6.   LENDER'S RIGHT TO PROTECT ITS RIGHTS IN THE PROPERTY; MORTGAGE INSURANCE:** If (A) I do not keep my promises and agreements made in this Security Instrument; or (B) someone, including me, begins a legal proceeding that may significantly affect Lender's rights in the Property (such as a legal proceeding in bankruptcy, in probate, for condemnation or to enforce laws or regulations), Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Lender may, but is not required to, give me notice before Lender takes any of these actions. Although Lender may take action under this Paragraph 6, Lender does not have to do so.

OR 656   PG 332

I will pay to Lender any amounts, with interest, which Lender spends under this Paragraph 6. I will pay those amounts to Lender when Lender sends me a notice requesting that I do so. I will also pay interest on those amounts at the Note rate. Interest on each amount will begin on the date that the amount is spent by Lender. However, Lender and I may agree in writing to terms of payment that are different from those in this Paragraph. This Security Instrument will protect Lender in case I do not keep this promise to pay those amounts with interest.

If Lender required mortgage insurance as a condition of making the loan that I promise to pay under the Note, I will pay the premiums for that mortgage insurance. I will pay the premiums until the requirement for mortgage insurance ends according to my written agreement with Lender or according to applicable law. In addition to the above, Lender shall have a right (but not an obligation) to make payments on any prior mortgage and demand that such sums be paid to it immediately with interest at the Note rate.

**7. LENDER'S RIGHT TO INSPECT THE PROPERTY:** Lender, and others authorized by Lender, may enter on and inspect the Property. They must do so in a reasonable manner and at reasonable times. Before or at the time an inspection is made, Lender must give me notice stating a reasonable purpose for the inspection.

**8. AGREEMENTS ABOUT CONDEMNATION OF THE PROPERTY:** A taking of property by any governmental authority by eminent domain is known as "condemnation." A taking gives Lender my right: (A) to proceeds of all awards or claims for damages resulting from condemnation or other governmental taking of the Property; and (B) to proceeds from a sale of the Property that is made to avoid condemnation. All of those proceeds will be paid to Lender.

If all of the Property is taken, the proceeds will be used to reduce the Sums Secured. If any of the proceeds remain after the amount that I owe to Lender has been paid in full, the remaining proceeds will be paid to me. Unless Lender and I agree otherwise in writing, if only a part of the Property is taken, the amount that I owe to Lender will be reduced only by the amount of proceeds multiplied by the following fraction: (A) the total amount of the Sums Secured immediately before the taking, divided by (B) the fair market value of the Property immediately before the taking. The remainder of the proceeds will be paid to me.

If I abandon the Property, or if I do not answer, within 30 days, a notice from Lender stating that a governmental authority has offered to make a payment or to settle a claim for damages, Lender has the authority to collect the proceeds. Lender may then use the proceeds to repair or restore the Property or to reduce the Sums Secured. The 30-day period will begin when the notice is given.

If any proceeds are used to reduce the amount of principal which I owe to Lender under the Note, that use will not delay the due date or change the amount of any monthly payments under the Note and under Paragraph 1 above. However, Lender and I may agree in writing to those delays or changes.

**9. CONTINUATION OF BORROWER'S OBLIGATIONS AND OF LENDER'S RIGHTS:** (A) Borrower's Obligations - Lender may allow a person who takes over my rights and obligations to delay or to change the amount of the monthly payments of principal and interest due under the Note or under this Security Instrument. Even if Lender does this, however, that person and I will both still be fully obligated under the Note and under this Security Instrument.

Lender may allow those delays or changes for a person who takes over my rights and obligations, even if Lender is requested not to do so. Lender will not be required to bring a lawsuit against such a person for not fulfilling obligations under the Note or under this Security Instrument, even if Lender is requested to do so.

(B) Lender's Rights - Even if Lender does not exercise or enforce any right of Lender under this Security Instrument or under the law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if Lender obtains insurance, pays taxes, or pays other claims, charges or liens against the Property, Lender will have the right under Paragraph 18 below to demand that I make immediate payment in full of the amount that I owe to Lender under the Note and under this Security Instrument.

**10. OBLIGATIONS OF BORROWER AND OF PERSONS TAKING OVER BORROWER'S RIGHTS OR OBLIGATIONS:** Any person who takes over my rights or obligations under this Security Instrument will have all of my rights and will be obligated to keep all of my promises and agreements made in this Security Instrument. Similarly, any person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's agreements made in this Security Instrument.

If more than one person signs this Security Instrument as Borrower, each of us is fully obligated to keep all of Borrower's promises and obligations contained in this Security Instrument. Lender may enforce Lender's rights under this Security Instrument against each of us individually or against all of us together. This means that any one of us may be required to pay all of the Sums Secured. However, if

one of us does not sign the Note: (A) that person is signing this Security Instrument; (B) that person is not personally obligated to pay the Sums Secured; and (C) that person agrees that Lender may agree with the other Borrowers to delay enforcing any of Lender's rights or to modify or make any accommodations with regard to the terms of this Security Instrument or the Note without that person's consent.

**11. LOAN CHARGES:** If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed permitted limits: (A) any such loan charges shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (B) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

**12. LEGISLATION AFFECTING LENDER'S RIGHTS:** If a change in applicable law would make any provision of the Note or this Security Instrument unenforceable, Lender may require immediate payment in full of all Sums Secured by this Security Instrument.

**13. NOTICES REQUIRED UNDER THIS SECURITY INSTRUMENT:** Any notice that must be given to me under this Security Instrument will be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice will be addressed to me at the address stated in the section above titled "Description of the Property." A notice will be given to me at a different address if I give Lender a notice of my different address. Any notice that must be given to Lender under this Security Instrument will be given by mailing it to Lender's address stated in Paragraph (C) of the section above titled "Words Used often in this Document." A notice will be mailed to Lender at a different address if Lender gives me a notice of the different address. A notice required by this Security Instrument is given when it is mailed or when it is delivered according to the requirements of this Paragraph 13 or of applicable law.

**14. LAW THAT GOVERNS THIS SECURITY INSTRUMENT:** This Security Instrument is governed by federal law and the law that applies in the place where the Property is located. If any term of this Security Instrument or of the Note conflicts with the law, all other terms of this Security Instrument and of the Note will still remain in effect if they can be given effect without the conflicting term. This means that any terms of this Security Instrument and of the Note which conflict with the law can be separated from the remaining terms and the remaining terms will still be enforced.

**15. BORROWER'S COPY:** I will be given one conformed copy of the Note and of this Security Instrument.

**16. AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED:** Lender may require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. Lender also may require immediate payment in full if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person. However, Lender shall not require immediate payment in full if this is prohibited by federal law on the date of this Security Instrument.

**17. BORROWER'S RIGHT TO HAVE LENDER'S ENFORCEMENT OF THIS SECURITY INSTRUMENT DISCONTINUED:** Even if Lender has required immediate payment in full, I may have the right to have enforcement of this Security Instrument discontinued. I will have this right at any time before sale of the Property under any power of sale granted by this Security Instrument or at any time before a judgment has been entered enforcing this Security Instrument if I meet the following conditions:

(A) I pay to Lender the full amount that would have been due under this Security Instrument and the Note if Lender had not required immediate payment in full;
(B) I correct my failure to keep any of my other promises or agreements made in this Security Instrument;
(C) I pay all of Lender's reasonable expenses in enforcing this Security Instrument including, for example, reasonable attorneys' fees; and
(D) I do whatever Lender reasonably requires to assure that Lender's rights in this Security Instrument, Lender's rights under this Security Instrument, and my obligations under the Note and under this Security Instrument continue unchanged.

If I fulfill all four of these conditions, then the Note and this Security Instrument will remain in full effect as if immediate payment in full had never been required. However, I will not have the right to have Lender's enforcement of this Security Instrument discontinued if Lender has required immediate payment in full under Paragraphs 12 or 16 above.

16

### NON - UNIFORM COVENANTS

I also promise and agree with Lender as follows:

**18. LENDER'S RIGHTS IF BORROWER FAILS TO KEEP PROMISES AND AGREEMENTS:** Lender shall give notice to me prior to acceleration following my breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Paragraphs 12 or 16 unless applicable law provides otherwise). The notice shall specify: (A) the default; (B) the action required to cure the default; (C) a date, not less than 30 days from the date the notice is given to me, by which the default must be cured; and (D) that failure to cure the default on or before the date specified in the notice may result in acceleration of the Sums Secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform me of the right to have Lender's enforcement of this Security Instrument discontinued after acceleration and the right to assert in the foreclosure proceeding the nonexistence of a default or any other defense of mine to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender, at its option, may require immediate payment in full of all Sums Secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Paragraph 18, including, but not limited to, costs of title evidence.

**19. LENDER'S OBLIGATION TO DISCHARGE THIS SECURITY INSTRUMENT:** Upon payment of all Sums Secured by this Security Instrument, Lender shall discharge this Security Instrument. I shall pay any recordation costs. Lender may charge me a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under applicable law.

**20. CERTAIN OTHER ADVANCES:** In addition to any other Sum Secured hereby, this Security Instrument shall also secure the unpaid principal balance of, plus accrued interest on, any amount of money loaned, advanced or paid by Lender to or for my account and benefit, after this Security Instrument is delivered to and filed with the Recorder's Office, Union County, Ohio, for recording. Lender may make such advances in order to pay any real estate taxes and assessments, insurance premiums plus all other costs and expenses incurred in connection with the operation, protection or preservation of the Property, including to cure my defaults by making any such payments which I should have paid as provided in this Security Instrument, it being intended by this Paragraph 20 to acknowledge, affirm and comply with the provision of § 5301.233 of the Revised Code of Ohio.

---

### Request for Notice of Default and Foreclosure
### Under Superior Mortgages or Deeds of Trust

I and Lender request the holder of any mortgage, deed of trust or other encumbrance with a lien which has priority over this Security Instrument to give Notice to Lender, at Lender's address set forth on page one of this Security Instrument, of any default under the superior encumbrance and of any sale or other foreclosure action.

BY SIGNING BELOW, I accept and agree to the promises and agreements contained in pages 1 through 7 of this Security Instrument and in any rider(s) signed by me and recorded with it.

_____ 12/15/2005
Kevin R. Carson                    Borrower

_____ 12/15/2005
Tamara M. Carson                   Borrower

_____
                                   Borrower

_____
                                   Borrower

17

STATE OF OHIO                          }
                                       } ss:
COUNTY OF Union                        }


On the 15th day of        December      , in the year      2005   , before me, the undersigned,
a notary public in and for said state, personally appeared          Kevin R. Carson and
Tamara M. Carson, husband and wife

personally known to me or proved to me on the basis of satisfactory evidence, to be the individual(s)
whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they
executed same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the
individual or the person upon behalf of which the individual(s) acted, executed the agreement.


My Commission Expires:  4-3-09

                                                    **Linda Ansted Griese**
                                                    Notary Public
                                                    In and for the State of Ohio
                                                    My Commission Expires
                                                    April 3, 2008

Notary Public                      Union County, Ohio


This instrument was prepared by
LaToia Hairston
Quicken Loans Inc.
20555 Victor Parkway

HELOC OpenEnd Mortgage - Ohio         Page 7 of 7                    2004/03  heoh-7.pcl

OR656 PG336

# Exhibit A - LEGAL DESCRIPTION

Deal Number:    11-00786895                Title Number:    11-01927716  REV. NO. 1

Tax ID Number: **28-0011048.000**

*Land situated in the County of* **Union**, State of **Ohio** *is described as follows:*

Beginning at an iron stake at the Northwest corner of a 1.37 acre Tract of land owned by Robert Russell Carson, the above described place of beginning also being distance 486.00 feet, South 05 degrees and 31 minutes East, thence 203.03 feet,   North 68 degrees 45 minutes West, from the Northeast corner of land owned by said William Raymond Carson and Olive Ruth Carson, thence from the place of beginning along a line parallel with the center line of State Route 33 and a distance of 435.71 feet from said center line of State Route 33 with a bearing  North 68 degrees 45 minutes West, 221.11 feet to an iron stake, said iron stake also being the center line of a 30.00 Driveway Easement, thence along the center line Driveway Easement, thence along the center line of said Driveway Easement  South 21 degrees 15 minutes West, 204.09 feet to an iron stake, thence along the center line of said Driveway Easement  South 27 degrees 15 minutes East, 134.00 feet to an iron stake, thence along the center line of said Driveway Easement South 78 degrees 15 minutes East, 252.00 feet to an iron stake on the West property line of a 1.37 acre Tract of land owned by Robert Russell Carson, thence along the West property line of Robert Russell Carson Tract,   North 05 degrees 31 minutes West, 282.36 feet to an iron stake at the place of beginning.

Commonly known as:  19263 Nw Parkway, Marysville, OH  43040

TERESA L. MARKHAM
RECORDER, UNION CO., OHIO

2005 DEC 23   AM 10: 06

7600

OR 656   PG 337

19

EXHIBIT "2"

# HOME EQUITY LINE AGREEMENT, DISCLOSURE STATEMENT AND NOTE

Date: December 15, 2005                          Loan Number: /

Borrower: Kevin R. Carson and Tatara M. Carson


Property Address: 19263 NW Parkway
                  Marysville, OH 43040

**CREDIT TERMS SUMMARY**

Maximum Credit Line: $ 40,000.00

ANNUAL PERCENTAGE RATE: 7.625%.
Daily Periodic Rate: 0.0209%,   Index: 7.000%,
Lifetime Cap: 18.000%, Margin: 0.625%

This loan is made entirely within the provisions of the Ohio Mortgage Loan Act, sections 1321.51 to 1321.60 of the Ohio Revised Code.


In this Agreement, "I, me, my, us, we, our, Borrower and Co-Borrower" refer to each and all persons who sign this Agreement. The words "you, your and Lender" refer to     Quicken Loans Inc.     (hereinafter referred to as "Lender"). The word "Account" means the Home Equity Line of Credit established in my name. The word "Agreement" means this Home Equity Line Agreement, Disclosure Statement and Note. The Lender's address is 20555 Victor Parkway, Livonia, MI 48152.

If this is a joint account, all Borrowers must sign this Agreement and each will be individually responsible and liable for the entire Account balance.

**1. TERMS OF THIS AGREEMENT:** Subject to all terms of this Agreement, I understand that Lender will make loan advances up to my Maximum Available Credit for   10   years from the date of this Agreement (the "Draw Period"). The Maximum Credit Line is the amount stated above. The Maximum Available Credit is the Maximum Credit Line less the sum of all unpaid advances. After the Draw Period, Lender will not make any additional loan advances and I will be required to pay off the existing loan balance under the Account as described below in Section 7(b). I will pay off this loan balance in full within   20   years from the last day of the Draw Period. This   20   year period shall be called the "Repayment Period."

**2. LOAN ADVANCES:** Upon signing this Agreement, Lender will open an Account in my name. I will be able to obtain loan advances on this Account by requesting an advance over the telephone.

I understand that Lender may (but is not required to) offer me additional methods for requesting a loan advance such as home equity line of credit checks. If Lender does provide additional methods, I understand that Lender may offer these new access methods in lieu of requesting a loan advance over the telephone. If this occurs, Lender will notify me in advance of the terms and procedures for such additional methods.

If Lender is prohibited by federal law from making loan advances to me under this Agreement until three (3) business days after this Agreement has been signed, Lender will wait until that Period has expired before giving me access to this Account. All loan advances together will be considered a single, consolidated loan and will be referred to as the Principal. For purposes of this section, the words "Business Days" mean any day other than a Sunday or legal holiday.

Lender may, at its sole option, not honor any request for an advance:

a)  which is more than the Maximum Available Credit at that time.
b)  which is intended to be used in payment of all or part of the amount I owe Lender on the Account,
c)  if I am in default, as defined in Section 21, or
d)  if my Account is frozen or restricted in accordance with Section 20.

Lender may make a loan advance from my Account and add to the unpaid Principal Balance any amounts Lender may pay on my behalf for the Closing Costs, if any, in Section 14 and such other charges related to my Account as Lender believes necessary to protect Lender's or my rights.

**3. PROMISE TO PAY:** I promise to pay the amount of all Principal, finance charges, late charges, dishonored check charges, and other charges and costs (including all costs of Lender in securing, perfecting and enforcing its lien) that may be due under this Agreement or under the Security Agreement signed in connection with this Account, including all charges that may exceed the Maximum Credit Line as provided for in this Agreement. All past due amounts shall be due and payable immediately upon demand by Lender.

**4. STATEMENTS:** At the end of each monthly billing cycle in which there is a debit or credit balance of more than one dollar ($1.00) or in which a finance charge has been imposed, Lender will send me a statement (the "Statement") showing the activity in my Account during the cycle and the minimum amount (the "Minimum Monthly Payment") I ... st pay by the due date stated thereon.

**5. PREPAYMENT:** I may prepay my Account balance in whole or in part at any time, however, I must pay at least the Minimum Monthly Payment as stated in Section 7 below.

**6.  TERMINATION:** I may terminate this Account at any time, by notifying Lender in writing that I want to terminate this Account and paying all amounts that are due under this Agreement or will become due with the passage of time.  If I terminate this account within    0    years from the date of this Agreement, then I will be charged a termination fee in the amount of $ 0.00.

**7. MINIMUM MONTHLY PAYMENTS:**  The Billing Cycle will end on the  10th  of each month or if the  10th  is not a business day, then on the last business day preceding the  10th  of the month.  For purposes of this section, the words "Business Day" mean any day other than a Saturday, Sunday or legal holiday.  I must pay my Account balance in amounts no less than the following Minimum Monthly Payments:

(a) Payments During the Draw Period:  During the Draw Period, I will pay a Minimum Monthly Payment equal to all accrued finance charges,  plus any fees  or  other charges assessed during the current billing cycle rounded up to the nearest penny.   In addition to the Minimum Monthly Payment, I will pay all amounts past due and any amount in excess of my Maximum Credit Line.

(b) Payments During Repayment Period:  During the Repayment Period, I will pay a Minimum Monthly Payment which shall be equal to the sum of: (1)  1/240th of the Principal balance as of the closing date of the billing cycle in which the Draw Period terminates; and (2) all accrued finance charges and any other fees or charges assessed during the current billing cycle.  In addition to the Minimum Monthly Payment, I will pay all amounts past due and any amount in excess of my Maximum Credit Line.

(c) Application of payments: All payments shall be applied in the following order: finance charges, all other fees and charges, then to Principal.

**8. PERIODIC FINANCE CHARGES:**  All loan advances to my Account are subject to Finance Charges, which accrue from the date the loan advance is posted to my Account until the date the loan advance is paid in full. There is no grace period during which I may repay a loan advance without incurring a Finance Charge. Lender calculates the Finance Charges on my Account by multiplying the Daily Periodic Rate by the Daily Balance of my Account. Other than my first billing cycle, there will be only one Daily Periodic Rate during a billing cycle (Section 9 ANNUAL PERCENTAGE RATE provides how the ANNUAL PERCENTAGE RATE, and therefore the Daily Periodic Rate, is determined.) My first billing cycle may have more than one Daily Periodic Rate.  To get the Daily Balance, Lender takes the beginning Principal balance each day, adds any new loan advances and subtracts any payments of, or credits to, Principal. The Finance Charges for each day in the billing cycle are added together resulting in the Periodic Finance Charge for that billing cycle.  Finance charges, late charges, dishonored check charges and other charges which are not added to the Principal balance and any payments of those charges are excluded from the Finance Charge calculation.

**9.  ANNUAL PERCENTAGE RATE:**  The Account is a variable rate plan, and the Daily Periodic Rate assessed may change monthly based on changes in the Index. The "Index" is the "Prime Rate" as published by "The Wall Street Journal," as of the first day of the billing cycle or, if no Index is published that day, then the most recent Index published prior to that day. If "The Wall Street Journal" publishes a range of Prime Rates on any day, then Lender will use the highest rate published. If "The Wall Street Journal" ceases to publish a Prime Rate, then Lender, in its sole discretion, may substitute a comparable Index. The ANNUAL PERCENTAGE RATE for any given billing cycle will be the Index plus the Margin.

A change in the Index will result in a change to the ANNUAL PERCENTAGE RATE and Daily Periodic Rate. The ANNUAL PERCENTAGE RATE includes only interest (Finance Charges) and no other costs of the Account.  The ANNUAL PRECENTAGE RATE and Daily Periodic Rate may increase or decrease in accordance with this section. An increase or decrease to the ANNUAL PERCENTAGE RATE and the Daily Periodic Rate will increase or decrease your Minimum Monthly Payment.

The ANNUAL PERCENTAGE RATE will never exceed the lesser of (a) the Lifetime Cap that is stated on the first page of the Agreement or (b) the maximum rate that may be charged under applicable laws.  If the Account is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Account exceed the permitted limits, then (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit, and (b) any sums already collected from you which exceeded the permitted limits will be refunded to you.  Lender may choose to make this refund by reducing the Principal owed under this Agreement or by making a direct payment to you.  The Index, Margin, ANNUAL PERCENTAGE RATE and Daily Periodic Rate on the date of this Agreement are stated on the first page of this Agreement.

[N/A](Applies only if checked) Notwithstanding the foregoing, the ANNUAL PERCENTAGE RATE and Daily Periodic Rate stated on the first page of this Agreement are discounted and do not reflect the current value of the index on the date of this Agreement.  If these terms were not discounted, the ANNUAL PERCENTAGE RATE would be    N/A    and the Daily Periodic Rate would be    N/A   .  These discounted terms will remain in effect for the initial    N/A    of the term of the Account, after which time the foregoing method of determining the ANNUAL PERCENTAGE RATE and Daily Periodic Rate will take effect and remain in effect for the remainder of the Account's term.

**10. LATE FEES:** Lender will charge me a late fee for any payment that is not received by Lender within Ten days of its due date. This fee will be equal to Five and  No-Thousandths                    percent ( 5.000%) of the Principal and Finance Charge payment that is due , or $15.00 (fifteen dollars) whichever is greater.

**11. ANNUAL FEE:** Lender will charge me an annual fee of $50.00       beginning on the first anniversary of my Account and on each Anniversary thereafter. The annual fee will not be refunded if the Account is terminated or frozen before the end of any annual period, unless applicable law provides otherwise.

**12. DISHONORED CHECK CHARGE:** If any payment I make on my Account is by a check that is dishonored, for any reason, then Lender has the right to charge me a dishonored check charge equal to $ 0.00.

**13. OVER LIMIT FEE:** If during any Billing Cycle, I exceed my Credit Line, then Lender may charge me an Over Limit charge of $ 0.00      . This fee will be charged regardless of Lender's decision to honor a check that created the Over Limit.

**14. FINANCE and CLOSING COSTS:** As itemized in the following list, I agree to pay charges as a condition of Lender opening my Account. Any amounts for these items advanced under the Account will be treated as Principal.

| Finance Costs: | Amount: |
|---|---|
| Flood Life of Loan Coverage | $4.00 |
| Settlement Fee | $50.00 |
| **Finance Cost Totals :** | **$54.00** |

| Closing Costs: | Amount: |
|---|---|
| Recording Fees | $84.00 |
| Lender Paid Fees (Credit) | $138.00 |
| **Closing Cost Totals:** | **$84.00** |
| **Total Costs:** | **$0.00** |

KLC
JMC

**15. TAX DEDUCTIBILITY:** You should consult a tax advisor regarding the deductibility of interest and charges for the Account.

22

**16. PROPERTY INSURANCE:** Under the Security Agreement, I must obtain property insurance in such amounts and against such risks as Lender may reasonably require with the insurance policy naming Lender, its successors and/or assigns, as loss payee. I may obtain property insurance (including flood insurance, when required) from any agent, broker or other person of my choice. However, for reasonable cause, Lender has the right to refuse to accept any insurance company or policy I present to Lender.

**17. COLLECTION COSTS:** Except in Wisconsin, if Lender refers my Account to an attorney or collection agency for collection, I agree to pay Lender's reasonable costs for collection, including all reasonable attorney's fees, not to exceed the maximum allowed by applicable state law.

**18. CREDIT REVIEW:** Now, and in the future, I authorize Lender at any time to make or order whatever credit investigation or reports Lender feels are necessary and proper to evaluate and re-evaluate my credit or financial standing and/or employment. I authorize Lender to share with credit bureaus, its credit experience with me.

**19. SECURITY:** I have given or will give Lender, a security interest or mortgage ("Security Agreement") on the real or personal property that is my principal or secondary residence which is located at:
19263 NW Parkway, Marysville, OH  43040

("the Security"). I warrant that this Security is the principal or secondary residence of, and owned by, either the Borrower and/or Co-Borrower. The Security Agreement will secure all amounts that I owe under this Agreement and under the Security Agreement. If I have given Lender, or will in the future give Lender, a lien or security interest in any of my property for some other obligation or in some other security agreement, then that property will also secure this Agreement, provided however, that if such property is my principal or secondary residence and is not the Security listed in this Section 19, then such property shall not secure this Agreement regardless of any other agreement between Lender and me.

**20. LENDER'S RIGHT TO FREEZE THE ACCOUNT OR REDUCE MY MAXIMUM CREDIT LINE:** In addition to any other rights Lender has under this Agreement, and subject to applicable law, Lender may either freeze my Account (not permit me to access my Account for additional loan advances) or reduce my Maximum Credit Limit if during the Draw Period any of the following occurs: (a) the value of the Security declines significantly below the value for which it is appraised or valued when the Account was opened; (b) Lender reasonably believes that I will be unable to make the payments required under this Agreement because of a material change in my financial condition; (c) I am in default of any material obligation under this Agreement; (d) Lender is prevented by any governmental action from applying to my Account the ANNUAL PERCENTAGE RATE that is provided for in this Agreement; (e) the priority of Lender's security interest in the Security is adversely affected by governmental action to the extent that the value of the Security is less than 120% of the Maximum Credit Line; or (f) Lender is notified by any appropriate regulatory authority that continued advances would constitute an unsafe and unsound practice. Lender will notify me if my Account is frozen or if my Maximum Credit Limit is reduced. If the reason for such action no longer exists and I would like my credit privileges restored, then it is my responsibility to request Lender to restore these privileges and to provide Lender with evidence, satisfactory to Lender, that such condition(s) no longer exists. If after the review of such evidence and after such other investigation Lender deems reasonable, Lender agrees that the condition(s) resulting in such action no longer exist and that no other condition that would permit such action currently exists, then Lender will restore my credit privileges.

**21. DEFAULT:** Subject to applicable law, I will be in default under this Agreement if any of the following occurs: (a) I fail to make any payment required by this Agreement; (b) the total amount of the unpaid advances exceeds my Maximum Credit Line and I fail to repay the excess amount when Lender requests payment; (c) any material statement in my application for credit, this Agreement, the Security Agreement or any other document I give Lender at any time with respect to this Account was, or is, false, misleading or fraudulent; (d) all borrowers have died; (e) I, or any owner of the Security, do not obtain and maintain the required property insurance and, if applicable, flood insurance on the Security; (f) the Security is condemned, in whole or in part, or is subjected to an eminent domain proceeding; (g) taxes, maintenance charges, common charges, assessments or any other charges that are liens on the Security are not paid when due; (h) the Security is sold or transferred without the consent of Lender; (i) a lien is permitted to be filed or placed on the Security which lien is superior to the lien of the Security Agreement; or (j) a lien which is superior to the lien of the Security Agreement is in foreclosure or Lender reasonably expects the lien to be foreclosed or the debt which such lien secures is in default.

**22. LENDER'S RIGHTS WHEN A DEFAULT IS DECLARED:** Once a default has occurred, whether or not Lender has declared the Account to be in default, Lender may, but is not required to, suspend the Account without notice to me, refuse to allow me to use the Account to make further advances and declare the entire balance then outstanding under the Account to be immediately due and payable. Lender may also begin to foreclose the lien of the Security Agreement as provided by law and/or the Security Agreement. This means that after legal proceedings, Lender may have the Security sold at my expense, in order to pay Lender what I owe it under this Agreement. The money remaining after all foreclosure and sale related expenses are paid is to be applied against the amounts then due Lender under this Agreement and I understand that I remain liable for any balance due under this Agreement if the money remaining is not enough to fully pay the amount due to Lender, plus its legal expenses, court costs, alternative dispute resolution expenses, and other expenses incurred in bringing the foreclosure action, as permitted by applicable state law. At any time after the suspension or acceleration of the Account, Lender has the sole right to reinstate the Account in accordance with its current procedures, without in any way waiving any rights Lender has under this Agreement.

**23. SALE OR TRANSFER OF THE SECURITY OR ADDITIONAL MORTGAGES:** If I sell or transfer ownership of the Security or enter into a contract to sell or transfer any ownership of the Security without the consent of Lender, then I will be in default and Lender may exercise all rights under Section 22. If I place another mortgage on the Security or otherwise further encumber it, then Lender may suspend my credit privileges and refuse to honor requests for a loan advance.

**24. CHANGE OF TERMS:** Subject to applicable law, Lender may not change the terms of this Agreement except (a) upon my written agreement, (b) if the change is insignificant or (c) if the change will unequivocally be to my benefit. Lender will notify me of all changes prior to the effective date of those changes.

**25. ASSIGNMENT:** I may not assign my Account privileges or delegate my obligation to repay amounts that I owe Lender to any other person without Lender's written consent. I understand that any attempt to assign such privileges or delegate such obligations without Lender's consent will be void and of no effect. This Agreement obligates me and my heirs and personal representatives. Lender may assign this Account at any time without my consent. If this Account is assigned by Lender, I will be given notice as required by applicable law.

**26. WAIVER:** Lender can waive or decline to enforce any of Lender's rights under this Agreement at any time without affecting any of Lender's rights under this Agreement. Without in any way limiting the preceding sentence, Lender does not have to tell me if any amount owing under this Agreement is not paid by the date it becomes due. In addition, Lender can do any of the following things without telling me and without losing any of Lender's rights against me or the Security: (a) accept as partial payment a check marked "Paid in Full" or with similar language as payment for any amount owing under this Agreement.; (b) give additional time for payment of any amount owing under this Agreement; or (c) exercise, delay exercising or give up any right against any person. In addition, Lender may delay enforcing any of Lender's rights under this Agreement or the Security Agreement or any other related rights without losing them. Any waiver by Lender of any other such rights will not be a waiver of those rights on any other occasion.

**27. JOINT ACCOUNTS:** If more than one person signs this Agreement, then this is a joint account and each signer will be individually responsible and liable for the entire account balance. Upon written request by any party to the Account or upon receipt of inconsistent written instructions, Lender may, at its sole option and without notice to any other party, refuse any request for a loan advance or for an increase in the Maximum Credit Line or refuse any other request with respect to the Account. Regardless of this, in the absence of a court order, Lender may, without liability on Lender's part, honor any request with respect to the Account from any Borrower or Co-Borrower in spite of Lender receiving inconsistent instructions or request.

**28. NOTICES:** I understand that I must notify Lender immediately in writing of any change in my financial or employment condition or change of address as shown on my application, as well as any judgment, lien, attachment or execution if issued against me or my property (including the Security). I also agree to notify Lender immediately with respect to a default on any other mortgage or agreement relating to the Security or if I move from the Property. All notices and monthly statements will be delivered to me at the Security address or at such other address as I may designate by notice to Lender. Notices sent to the address will be effective for all purposes under this Agreement.

**29. FIRST MORTGAGE:** I warrant and represent that (a) I will deliver to Lender complete copies of the First Mortgage(s) affecting the Security and the notes secured thereby; (b) all such First Mortgages are in full force and effect without default; and (c) the recording of the Security Agreement or other aspects of this transaction will not cause a default under that First Mortgage. I agree not to modify or extend the First Mortgage without the prior written consent of Lender, and agree to pay when and as due all amounts due under the First Mortgage and keep all promises made in the First Mortgage.

**30. ENTIRE AGREEMENT; CONTINUED EFFECTIVENESS:** I understand that this Agreement is the entire Agreement between Lender and me, and it may not be contradicted by evidence of any alleged oral agreement. **Oral agreements or commitments to loan money, extend credit or renew such debt are not enforceable. To protect me (borrower(s)) and you (Lender) from misunderstanding or disappointment, any agreements we reach covering such matters are contained in this writing, which is the complete and exclusive statement of the agreement between us, except as we may later agree in writing to modify it.** If any part of this Agreement is determined by a court to be invalid, the rest will remain in effect.

**31. APPLICABLE LAW:** This Agreement and my Account will be governed by, and interpreted under, federal law to the fullest extent possible. To the extent federal law does not apply, then this Agreement and my Account shall be governed by, and interpreted under the state law where the property is located, whether or not I live in that state.



**Questions and Billing Errors:**

I will let Lender know immediately if I have any questions about my Statement. I can call Lender at the telephone number appearing on the Statement if I think Lender has made a mistake on my Statement. I will read and follow the Fair Credit Billing Act Notice, printed below, concerning my rights to dispute billing errors. Also, a statement of my rights will either appear on the back of each Statement or be sent to me annually.

I agree to the terms of this Agreement and the Security Agreement and acknowledge that I have each, individually and separately, received a copy of this Agreement, two copies of the Notice of Right to Cancel (if applicable) and a copy of the Security Agreement, all completely filled in.

**CAUTION - IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT.**

NOTICE TO CO-SIGNER: YOUR SIGNATURE ON THIS NOTE MEANS THAT YOU ARE EQUALLY LIABLE FOR REPAYMENT OF THIS LOAN. IF THE BORROWER DOES NOT PAY, THE LENDER HAS A LEGAL RIGHT TO COLLECT FROM YOU.

_Kevin R. Carson_  12/15/2005
Kevin R. Carson                    Borrower

_Tamara M. Carson_  12/15/2005
Tamara M. Carson                   Borrower

_____            _____
                        Borrower                        Borrower

**WITHOUT RECOURSE**
Pay to the Order of
**GMAC BANK**
_____
QUICKEN LOANS, INC.
By _____
SCOTT JOHNSON
CAPTURE MANAGER

EXHIBIT "3"

After Recording Return to:
Specialized Loan Servicing, LLC
8742 Lucent Blvd, Suite 300
Highlands Ranch, CO 80129-2386

Reference No.:

MIN:   100039046927089793                          MERS phone: 1-888-679-6377

**Reference Number(s) of Documents assigned or released:**  323603; OR 656 PG 330

**Grantor:**  Mortgage Electronic Registration Systems, Inc. solely as nominee for Quicken Loans Inc.

**Grantee:**  U.S. Bank National Association, as indenture Trustee of the GMACM Home Equity Loan
Trust 2004 HE4

**Assessor's Property Tax Parcel/Account Number(s):**  28-0011048-000

### Assignment of Mortgage

For Value Received the undersigned hereby grants, conveys, assigns and transfers to U.S. Bank National
Association, as indenture Trustee of the GMACM Home Equity Loan Trust 2004 HE4 whose address is c/o
Specialized Loan Servicing, LLC, 8742 Lucent Blvd, Suite 300, Highlands Ranch, CO 80129-2386, its
interest under that certain Mortgage, dated December 15, 2005 executed by Kevin R. Carson and Tamara M.
Carson Grantor to, Mortgage Electronic Registration Systems, Inc. solely as nominee for Quicken Loans
Inc., Grantee, and recorded on December 23, 2005 as 323603; OR 656 PG 330, Records of Union County,
Ohio, describing land therein as:

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".

Together with the Note or Notes therein described or referred to, the money due and to become due therein
with interest, and all rights accrued or to accrue under said Mortgage

Dated _May 16_, 2012

Mortgage Electronic Registration Systems, Inc. solely
as nominee for Quicken Loans Inc.

BY: _____   **Thaddeus Larimer**
~~Assistant Secretary~~
Name                          Title

26

State of _____Colorado_____ )
                                  ) ss.
County of _____Douglas_____ )

On __May 16, 2012__, before me, the undersigned, a Notary Public in and for the State of __Colorado__ duly commissioned and sworn, personally appeared __Thaddeus Larimer__, to me known to be the _Assistant Secretary_ of Mortgage Electronic Registration Systems, Inc. solely as nominee for Quicken Loans Inc. acknowledged the said instrument to be the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned, and on oath stated that he/she is authorized to execute the said instrument and that the seal affixed is the corporate seal of said corporation.

_____
Notary Public in and for the State of ___Colorado_,
residing at: _Highlands Ranch, CO_
My Commission expires: _____1-28-2013_

JEFF PLACHKO
NOTARY
PUBLIC
STATE OF COLORADO
My Commission Expires
01-28-2013

Carson, Kevin R. and Carson, Tamara M.

27

# Exhibit A - LEGAL DESCRIPTION

**Deal Number:**  11-00786895                    **Title Number:**   11-01927716  REV. NO. 1

Tax ID Number: 28-0011048.000

*Land situated in the County of Union, State of Ohio is described as follows:*

Beginning at an iron stake at the Northwest corner of a 1.37 acre Tract of land owned by Robert Russell Carson, the above described place of beginning also being distance 486.00 feet,  South 05 degrees and 31 minutes East, thence 203.03 feet,   North 68 degrees 45 minutes West, from the Northeast corner of land owned by said William Raymond Carson and Olive Ruth Carson, thence from the place of beginning along a line parallel with the center line of State Route 33 and a distance of 435.71 feet from said center line of State Route 33 with a bearing  North 68 degrees 45 minutes West, 221.11 feet to an iron stake, said iron stake also being the center line of a 30.00 Driveway Easement, thence along the center line Driveway Easement, thence along the center line of said Driveway Easement  South 21 degrees 15 minutes West, 204.09 feet to an iron stake, thence along the center line of said Driveway Easement  South 27 degrees 15 minutes East, 134.00 feet to an iron stake, thence along the center line of said Driveway Easement South 78 degrees 15 minutes East, 252.00 feet to an iron stake on the West property line of a 1.37 acre Tract of land owned by Robert Russell Carson, thence along the West property line of Robert Russell Carson Tract,   North 05 degrees 31 minutes West, 282.36 feet to an iron stake at the place of beginning.

Commonly known as: 19263 Nw Parkway, Marysville, OH  43040

TERESA L. MARKHAM
RECORDER, UNION CO., OHIO

2005 DEC 23  AM 10: 06

*7600*

28

EXHIBIT "4"

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA
# ORANGE COUNTY DIVISION

In re *Kevin Ray Carson and Tamara Marie Carson*

Case No. _____

Chapter   7

_____ / Debtor

# SUMMARY OF SCHEDULES

Indicate as to each schedule whether that schedule is attached and state the number of pages in each. Report the totals from Schedules A, B, D, E, F, I, and J in the boxes provided. Add the amounts from Schedules A and B to determine the total amount of the debtor's assets. Add the amounts of all claims from Schedules D, E, and F to determine the total amount of the debtor's liabilities. Individual debtors must also complete the "Statistical Summary of Certain Liabilities and Related Data" if they file a case under chapter 7, 11, or 13.

| NAME OF SCHEDULE | Attached (Yes/No) | No. of Sheets | ASSETS | LIABILITIES | OTHER |
|---|---|---|---|---|---|
| A-Real Property | Yes | 1 | $ 250,001.00 | | |
| B-Personal Property | Yes | 4 | $ 152,947.00 | | |
| C-Property Claimed as Exempt | Yes | 1 | | | |
| D-Creditors Holding Secured Claims | Yes | 2 | | $ 374,105.00 | |
| E-Creditors Holding Unsecured Priority Claims (Total of Claims on Schedule E) | Yes | 2 | | $ 31,500.00 | |
| F-Creditors Holding Unsecured Nonpriority Claims | Yes | 2 | | $ 59,981.00 | |
| G-Executory Contracts and Unexpired Leases | Yes | 1 | | | |
| H-Codebtors | Yes | 1 | | | |
| I-Current Income of Individual Debtor(s) | Yes | 1 | | | $ 2,000.00 |
| J-Current Expenditures of Individual Debtor(s) | Yes | 2 | | | $ 4,136.78 |
| TOTAL | | 17 | $ 402,948.00 | $ 465,586.00 | |

FORM B6A (Official Form 6A) (12/07)

In re __Kevin Ray Carson and Tamara Marie Carson_____,    Case No._____

Debtor(s)    (if known)

# SCHEDULE A-REAL PROPERTY

Except as directed below, list all real property in which the debtor has any legal, equitable, or future interest, including all property owned as a cotenant community property, or in which the debtor has a life estate. Include any property in which the debtor holds rights and powers exercisable for the debtor's own benefit. If the debtor is married, state whether the husband, wife, both, or the marital community own the property by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community." If the debtor holds no interest in real property, write "None" under "Description and Location of Property."

**Do not include interests in executory contracts and unexpired leases on this schedule. List them in Schedule G-Executory Contracts and Unexpired Leases.**

If an entity claims to have a lien or hold a secured interest in any property, state the amount of the secured claim. See Schedule D. If no entity claims to hold a secured interest in the property, write "None" in the column labeled "Amount of Secured Claim."

If the debtor is an individual or if a joint petition is filed, state the amount of any exemption claimed in the property only in Schedule C - Property Claimed as Exempt.

| Description and Location of Property | Nature of Debtor's Interest in Property | Husband—H Wife—W Joint—J Community—C | Current Value of Debtor's Interest, in Property Without Deducting any Secured Claim or Exemption | Amount of Secured Claim |
|---|---|---|---|---|
| SFR-Former Residence 19263 NW Parkway Marysville, OH 43040 | Husband and Wife | C | $ 250,000.00 | $ 250,000.00 |
| Interest in Timeshare Value if any unknown | | C | $ 1.00 | $ 1.00 |
| | | | **TOTAL $** 250,001.00 | |

No continuation sheets attached

**TOTAL $**    250,001.00

(Report also on Summary of Schedules.)

30

B6D (Official Form 6D) (12/07)

In re Kevin Ray Carson and Tamara Marie Carson _____,    Case No._____
                    Debtor(s)                                                        (if known)

# SCHEDULE D - CREDITORS HOLDING SECURED CLAIMS

State the name, mailing address, including zip code, and last four digits of any account number of all entities holding claims secured by property of the debtor as of the date of filing of the petition. The complete account number of any account the debtor has with the creditor is useful to the trustee and the creditor and may be provided if the debtor chooses to do so. List creditors holding all types of secured interests such as judgment liens, garnishments, statutory liens, mortgages, deeds of trust, and other security interests.

List creditors in alphabetical order to the extent practicable. If a minor child is the creditor, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. §112 and Fed. R. Bankr. P. 1007(m). If all secured creditors will not fit on this page, use the continuation sheet provided.

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor," include the entity on the appropriate schedule of creditors, and complete Schedule H – Codebtors. If a joint petition is filed, state whether the husband, wife, both of them, or the marital community may be liable on each claim by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community."

If the claim is contingent, place an "X" in the column labeled "Contingent." If the claim is unliquidated, place an "X" in the column labeled "Unliquidated." If the claim is disputed, place an "X" in the column labeled "Disputed." (You may need to place an "X" in more than one of these three columns.)

Total the columns labeled "Amount of Claim Without Deducting Value of Collateral" and "Unsecured Portion, if Any" in the boxes labeled "Total(s)" on the last sheet of the completed schedule. Report the total from the column labeled "Amount of Claim Without Deducting Value of Collateral" also on the Summary of Schedules and, if the debtor is an individual with primarily consumer debts, report the total from the column labeled "Unsecured Portion, if Any" on the Statistical Summary of Certain

☐ Check this box if debtor has no creditors holding secured claims to report on this Schedule D.

| Creditor's Name and Mailing Address Including ZIP Code and Account Number (See Instructions Above.) | Co-Debtor | Date Claim was Incurred, Nature of Lien, and Description and Market Value of Property Subject to Lien H--Husband W--Wife J--Joint C--Community | Contingent | Unliquidated | Disputed | Amount of Claim Without Deducting Value of Collateral | Unsecured Portion, If Any |
|---|---|---|---|---|---|---|---|
| Account No: 2439<br><br>Creditor # : 1<br>Citimortgage Inc<br>Po Box 9438<br>Gaithersburg MD 20898 | J | 2005-12-15<br><br>SFR-Former Residence<br><br>Value: $ 250,000.00 | | | | $ 313,694.00 | $ 63,694.00 |
| Account No: 9353<br><br>Creditor # : 2<br>Promotora Sunset Beach<br>21 OVERLAND INDUSTRIAL B<br>Asheville NC 28806 | | 2010-04-09<br><br>Interest in Timeshare<br><br>Value: $ 1.00 | X | | | $ 1,500.00 | $ 1,499.00 |
| Account No: 9353<br><br>Representing:<br>Promotora Sunset Beach | | MERIDIAN FINANCIAL SVC<br>21 OVERLAND INDUSTRIAL B<br>ASHEVILLE NC 28806<br><br>Value: | | | | | |

1   continuation sheets attached

Subtotal $ (Total of this page)    $ 315,194.00    $ 65,193.00

Total $ (Use only on last page)

(Report also on Summary of Schedules.)    (If applicable, report also on Statistical Summary of Certain Liabilities and Related Data)

31

B6D (Official Form 6D) (12/07)   - Cont.

In re _Kevin Ray Carson and Tamara Marie Carson_____,     Case No._____
          **Debtor(s)**                                                                                      (if known)

## SCHEDULE D - CREDITORS HOLDING SECURED CLAIMS

(Continuation Sheet)

| Creditor's Name and Mailing Address Including ZIP Code and Account Number (See Instructions Above.) | Co-Debtor | Date Claim was Incurred, Nature of Lien, and Description and Market Value of Property Subject to Lien H—Husband W—Wife J—Joint C—Community | Contingent | Unliquidated | Disputed | Amount of Claim Without Deducting Value of Collateral | Unsecured Portion, If Any |
|---|---|---|---|---|---|---|---|
| Account No: *4457* <br> *Creditor # : 3* <br> *Specialized Loan Services* <br> *8742 Lucent Blvd Ste 300* <br> *Highlands Ranch CO 80129* <br><br> Value: *$ 250,000.00* | J | *2005-12-20* <br> *2nd Mortgage* <br> *SFR-Former Residence* | | | | $ 30,657.00 | $ 30,657.00 |
| Account No: *1077* <br> *Creditor # : 4* <br> *US Bank* <br> *Po Box 130* <br> *Hillsboro OH 45133* <br><br> Value: *$ 14,540.00* | | *2008-03-13* <br> *Auto Lease* <br> *2008 Volvo C30* | | | | $ 14,369.00 | $ 0.00 |
| Account No: *2062* <br> *Creditor # : 5* <br> *VW Credit Inc* <br> *1401 Franklin Blvd* <br> *Libertyville IL 60048* <br><br> Value: *$ 10,175.00* | J | *2009-10-19* <br> *Auto Lease* <br> *2009 VW Jetta* | | | | $ 13,885.00 | $ 3,710.00 |
| Account No: <br><br> Value: | | | | | | | |
| Account No: <br><br> Value: | | | | | | | |
| Account No: <br><br> Value: | | | | | | | |

Sheet no. _1_  of _1_  continuation sheets attached to Schedule of Creditors
Holding Secured Claims

| | | |
|---|---|---|
| **Subtotal $** (Total of this page) | $ 58,911.00 | $ 34,367.00 |
| **Total $** (Use only on last page) | $ 374,105.00 | $ 99,560.00 |
| | (Report also on Summary of Schedules.) | (If applicable, report also on Statistical Summary of Certain Liabilities and Related Data) |

32